**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**(SOUTHERN DIVISION)**

SOLVARIS NET, LLC, a Michigan Corporation,
and MATTHEW LAUER, an Individual,

      Plaintiffs,                                 Case No. 21-

      v.                                       Hon.

BRUCE TOWNSHIP, a Michigan Civil Township, and
CONSTANCE SCHAPMAN, an Individual, and
DANIEL WALKER, an Individual, in their Individual
and official capacities,

      Defendants.

---

SERRA LAW FIRM, PLLC
(dba THE PRIVATE FIRM)
Reese Serra, Esq. (P74482)
Mateusz Wozniak (P78554)
Attorneys for Plaintiffs
805 Oakwood Dr., Ste. 101
Rochester, MI 48307
(248) 840-3139
info@thefirm.net

---

## <u>VERIFIED COMPLAINT</u>

There is no other pending or resolved civil action arising
out of the transactions or occurrences alleged in this Complaint.

_____
REESE SERRA (P74482)

NOW COME Plaintiffs, SOLVARIS NET, LLC ("Solvaris") and MATTHEW LAUER ("Lauer") (collectively, "Plaintiffs"), by and through their undersigned, and for their Verified Complaint against the Defendants, BRUCE TOWNSHIP, CONSTANCE SCHAPMAN, and DANIEL WALKER, state as follows:

## JURISDICTION AND PARTIES

1.     This is an action for violations of U.S. and Michigan constitutional rights, tortious interference with real property, libel and slander, and tortious interference with business contracts, relationships, and expectancies.

2.     This Court has federal question jurisdiction pursuant to 28 U.S.C. 1331.

3.     Plaintiff Solvaris is a Michigan Corporation registered to conduct business within the State of Michigan with its registered office in Bruce Township, County of Macomb, Michigan.

4.     Plaintiff Lauer is an individual who resides in Bruce Township, County of Macomb, Michigan.

5.     Defendant Township of Bruce ("Bruce Township") is a civil township located in Macomb County, Michigan and is within the jurisdiction of this Court.

6.     Defendant Constance Schapman ("Schapman") is an individual

who resides and works in Bruce Township, County of Macomb, Michigan and is within the jurisdiction of this Court.

7.    Defendant Schapman is the Secretary of the Bruce Township Planning Commission, which is an appointed position.

8.    Defendant Daniel Walker ("Walker") is an individual who resides and works in Bruce Township, County of Macomb, Michigan and is within the jurisdiction of this Court.

9.    Defendant Walker is the Vice Chairman of the Bruce Township Planning Commission, which is an appointed position.

10.   The amount in controversy exceeds $75,000, exclusive of interest, attorney's fees, and costs.

11.   The events giving rise to this lawsuit occurred within the Eastern District of Michigan.

## **FACTUAL BACKGROUND & GENERAL ALLEGATIONS**

### **Solvaris Addresses Need for High-Speed Internet in Bruce Township**

12.   For many years, Bruce Township residents did not have access to high-speed Internet.

13.   To address this issue, Lauer created a new division of Solvaris, to bring high-speed Internet access to the rural community of Bruce Township.

14.     Lauer conducted thorough, detailed research about various technologies and solutions to determine the most cost-effective solution for the community, and concluded that wireless service was the most cost-effective option.

15.     Lauer contacted Bruce Township to explore constructing a wireless communications tower on a portion of the vacant land that was connected to his home.

16.     Bruce Township, through Susan Brockmann ("Brockmann"), the Bruce Township Clerk at the time, denied Lauer's request, indicating that the Township Ordinance had a preference to locate communications towers on Township Property.

17.     Plaintiffs agreed to explore the possibility of erecting a wireless communications tower on Bruce Township property.

18.     At Brockmann's direction, Plaintiffs submitted to a Special Land Use ("SLU") permitting process.

19.     Solvaris wrote Bruce Township a check for $2,786.00 to cover the cost of the SLU permitting process.

20.     Upon information and belief, the amount charged by Bruce Township for the SLU process, at Brockmann's direction, was improper pursuant to FCC regulations.

21.    Upon information and belief, there is precedent in Bruce Township for providing land easements for a lump sum rather than a ground lease requiring monthly payments.

22.    Specifically, Bruce Township granted AT&T an easement for its equipment for the lump sum of $1.00, and granted Enbridge a 5-acre easement to lay pipeline for a lump sum of $38,000.

23.    When Plaintiffs requested an easement with a similar lump-sum payment arrangement, Brockmann and Richard Cory ("Cory"), the Township Supervisor at the time, advised Plaintiffs that such an arrangement wasn't likely to happen.

24.    Consequently, Solvaris, Inc. and Bruce Township entered into negotiations to construct a wireless communications tower on Township property, located at 76700 Hipp Road (the "Solvaris Tower").

25.    Many Bruce Township residents were in favor of the Solvaris Tower, and appeared at Board meetings to express their support and plea with the Township to approve the SLU. In particular, many residents indicated there was a desperate need for high-speed Internet access in connection with the education of their school-aged children. **See minutes of 5/29/2013 Bruce Township Planning Commission Meeting, attached hereto as <u>Exhibit 1</u>.**

26.    Plaintiffs' request for a SLU on Bruce Township property was approved, but was purportedly predicated upon Plaintiffs being granted a variance from the Bruce Township Zoning Board to allow the Solvaris Tower to be 200 feet tall, instead of the 175 feet.

27.    Plaintiffs' variance request was denied by the Bruce Township Zoning Board.

28.    Plaintiffs' subsequent Zoning Board appeal was denied, and Plaintiffs sought relief by filing an action in the Macomb County Circuit Court.

29.    Bruce Township decided to "update" its Zoning Ordinance by amending it to allow for a maximum height of 200 feet for wireless communications towers, and Plaintiffs dismissed their circuit court action.

**The Ground and Tower Lease and Amendments**

30.    On or about August 30, 2013, Solvaris, Inc., as Lessee, and Bruce Township, as Lessor, entered into a Ground and Tower Lease Agreement ("Original Lease"). **Exhibit 2, Original Lease**.

31.    Solvaris, Inc. and Bruce Township entered into the Original Lease so Solvaris, Inc. could "provid[e] high speed [I]nternet service, to residential commercial and industrial users, and may provide cable programming and cellular phone service." *Id*., at p. 4, ¶ 5; see also, p. 1, Recitals, ¶ B ("It is the intent of Solvaris and Lessor to provide Solvaris with

the opportunity to furnish high-speed Internet access and service to customers within Bruce Township and potentially adjacent municipalities in a cost effective and efficient manner").

32.   To that end, Bruce Township leased certain property to Solvaris, Inc.:

> .92 acres (800' x 50') of the Realty as depicted on Exhibit B ("Leased Premises"); for the purpose of constructing a new 175 foot wireless broadband tower, a 35' x 40' chain link fence surrounding the tower perimeter, and all of the equipment necessary to operate the tower including the radios and antennae mounted in the tower, and the ground equipment: DTE electricity meter, main circuit breaker panel, and two (24" x 36" x 72") equipment shelters. *Id.*, at p. 2, ¶ 1.

33.   The Original Lease contained an Assignment / Transfer provision:

> Lessee may not assign or transfer all or any part of this Agreement without advanced written approval from Lessor. **The Township shall have the first right of refusal if Lessee receives an offer to purchase the tower**. The Township shall notify Lessee, in writing, within thirty (30) days, whether it will exercise its right of first refusal. In the event of a change of ownership of Solvaris, the Lessor may terminate this Agreement by providing thirty (30) days written notice to Lessee. **Change in ownership shall mean the sale of more than fifty (50%) percent of the assets of Lessee**. *Id.*, at p. 3, ¶ 4 (emphasis added).

34.   The Original Lease provides that Solvaris is to use "the tower for the purpose of providing high speed [I]nternet service, to residential, commercial and industrial users, and may provide cable programming and

cellular phone service." *Id.*, at p. 5, ¶ 5.

35.    The Original Lease provided for co-location at ¶ 5.2, which states, in pertinent part, that "Lessee understands and accepts that Lessor desires to minimize communication and [I]nternet towers in the Township and therefore Lessor shall allow co-location on the tower provided that the tower is structurally sound to handle the additional equipment."

36.    The Original Lease did not grant Bruce Township an interest in Solvaris, Inc.'s business, nor did it permit Bruce Township to control Solvaris, Inc.'s business operations.

37.    In fact, the Original Lease specified that Solvaris, Inc. had the right to sell up to 49.9% of its assets without it being considered a change in ownership.

38.    Solvaris encountered issues with Bruce Township as soon as the Solvaris Tower was constructed.

39.    Despite the fact that an Ordinance amendment allowing a maximum tower height of 200 feet was in progress, and despite Brockmann's assurances to Plaintiffs that there would be no issues with constructing the Solvaris Tower at 200 feet in height, Bruce Township accused Plaintiffs of breaching the Agreement and violating the then-current maximum allowable height.

40.     Consequently, Solvaris incurred considerable expense in having to deconstruct a portion of the tower to lower the height to 175 feet tall.

41.     Shortly thereafter, the maximum height Ordinance was amended to allow for a maximum height of 200 feet. **See Exhibit 3, Excerpt of June 5, 2014 Bruce Township Special Board Meeting minutes, approving ordinance amendment**.

42.     Solvaris again incurred considerable expense in having to reconstruct the tower to the maximum allowable 200 feet necessary to provide the high-speed Internet services to as many Bruce Township residents as possible, and avoid the need for booster antennas throughout the Township, as contemplated by the Original Lease.

43.     On or about July 24, 2014, the Bruce Township Board unanimously voted to accept an amendment to the Original Lease. **See Exhibit 4, Excerpt of Minutes of July 24, 2014 Bruce Township Special Board Meeting**.

44.     On or about July 28, 2014, Solvaris, Inc. and Bruce Township entered into a First Amendment to the Ground and Tower Lease Agreement ("1st Amendment"). **Exhibit 5, First Amendment to Original Lease**.

45.     The 1st Amendment revised several provisions of the Original Lease, including that Solvaris would not be subject to rent adjustments, but

would instead, as part of its compensation to the Township, provide 3 WiFi hot spots to Bruce Township at no charge: 1 at the Romeo Community Center, 1 indoors at the Bruce Township Hall, and 1 outdoors at the Bruce Township Hall.

46.    At ¶ 4 of the 1st  Amendment, Section 5.2 of the Original Lease was deleted in its entirety and replaced with the following language:

> **5.2 Sublease/Co-Locator**. Lessee understands and accepts that Lessor desire to minimize communication and Internet towers in the Township and therefore Lessor shall allow colocation on the tower provided that the tower is structurally sound to handle the additional equipment. Lessee further agrees not to enter into any agreement to sublease, license, grant an easement for, or allow colocation upon any portion of the tower, without prior written approval from the Township Board (Co-Location Approval), the granting of which is in the reasonable discretion of the Township Board (but may not be unreasonably withheld). **No fees shall be required for granting a Township Co-Location Approval.** (emphasis added).

47.    On or about May 20, 2015, the Bruce Township Board unanimously voted to accept another amendment to the Original Lease.

**Exhibit 6, Excerpt of Minutes of May 20, 2015 Bruce Township Special Board Meeting.**

48.    The 2nd Amendment concerned only the service start dates for the 3 WiFi "hot spots" provided by Solvaris, free of charge, to Bruce Township.

49.    The Township later determined that it was not feasible for it to

authorize the hotspot at the Romeo Community Center, as same fell under the jurisdiction of Bruce Township Parks & Recreation.

50.    Solvaris has provided, and continues to provide, 2 WiFi hot spots to Bruce Township at no charge, although it costs Solvaris money to do so.

51.    On or about January 23, 2017, Solvaris, Inc. executed an Assignment Lease Interest ("Assignment"), conveying all of Solvaris, Inc.'s right, title, and interest in and to the Original Lease, as amended, to Solvaris Net, LLC (the Plaintiff herein). **Exhibit 7, Assignment**.

52.    The Assignment was made with the written consent and acknowledgement of Bruce Township. *Id.*

**The Defendants Seek to Intentionally Harm Plaintiffs in 2019**

53.    In early 2019, Lauer received an offer from Rural Telecommunications of America, Inc. ("RTA") to purchase the Solvaris Tower, wireless Internet business, and Bruce Township Lease interest.

54.    The proposed transaction would have allowed for business expansion and improved Internet service to more Bruce Township residents.

55.    Under the proposed transaction with RTA, Plaintiff Lauer was to remain in charge of the Solvaris wireless Internet service operations in Bruce Township.

56.    In accordance with the Original Lease's First Right of Refusal

Provision, Plaintiffs approached Bruce Township concerning the proposed transactions, and the matter was placed on the Board's Agenda for its regular meeting in May of 2019.

57.    Defendants Walker and Schapman, Bruce Township Planning Commission Members and close friends and protégé of Susan Brockmann, then began a defamation campaign against Solvaris and Lauer. **Exhibit 8, Letters dated May 17, 2019, from Schapman and Walker, respectively, to Bruce Township Board Members and Trustees, and Brockmann's responses concurring with same.**

58.    Among other things, Walker alleged that "this deal looks like nothing more than a money grab piggybacked on the townships sweet lease deal." *Id*.

59.    Walker's defamatory remarks were made without knowledge of the history behind the Solvaris Tower, and with reckless regard for the actual facts and circumstances of the situation, and with the malicious intent of sabotaging the RTA transactions.

60.    Walker's dissemination of libelous information concerning Plaintiffs substantially harmed Plaintiffs' business prospects and reputation.

61.    Walker's dissemination of libelous information concerning Plaintiffs triggered a tidal wave of similar sentiment towards Plaintiffs by

others in the Township, including appointed and elected Township officials.

62.    Upon information and belief, during communications involving Defendant Walker, former Bruce Township Supervisor Richard Cory, and other Bruce Township officials, former Supervisor Cory further inflamed negative sentiment towards Plaintiffs by espousing the opinion that if the Township did not purchase the Solvaris Tower, that it should be "torn down to the ground." **See video of June 19, 2019 Board Meeting, available at https://www.themitttv.com/video.php?id=804&cid=22, during which former Supervisor Cory admits to making this incendiary and provocative comment.**

63.    On or about May 13, 2019, a fictitious Facebook user posted a comment stating that "Solvaris has already raped us for years and they pay peanuts for the tower???" **See Exhibit 9**.

64.    Upon information and belief, the fictitious poster was or conspired with a Bruce Township official.

65.    Further, around the same time as the Facebook posting, Brockmann again attempted to use her influence as a Bruce Township official to dictate the terms of approval for the proposed RTA transaction and assignment of the Lease to RTA.

66.    Specifically, Brockmann convinced the Board to demand that if

Solvaris wanted Bruce Township to approve the co-location and lease assignment requests, Solvaris should pay Bruce Township $2,600.00 per month, rather than the agreed-upon $200 per month under the Lease.

67.    The Board's demand was in direct contradiction of ¶ 4 of the 1st Amendment, quoted at ¶ 42 above (**Exhibit 5**), which specifically provides that the Township would not require fees for Co-Location Approval, and Solvaris accordingly declined to acquiesce to these unreasonable demands (which again, came at the direction of Brockmann).

68.    On or about May 15, 2019, the Bruce Township Board voted unanimously to waive the Township's right of first refusal to purchase the Solvaris Tower. **Exhibit 10, Excerpt of Minutes of May 15, 2019 Bruce Township Regular Board Meeting.**

69.    However, Solvaris still needed written authorization from Bruce Township in order to sell, by assignment, its business to RTA.

70.    The Bruce Township Board again discussed the issue of the possible sale or assignment of Solvaris to RTA during the June 19, 2019 Regular Board Meeting, but no motion was advanced, and therefore no decision as to approval or denial of the sale was made. **Exhibit 11, Excerpt of Minutes of June 19, 2019 Bruce Township Regular Board Meeting.**

71.    Solvaris's negotiations with RTA languished while the Bruce

Township Board deliberated the issue, refused to make a decision, and otherwise delayed providing Solvaris with a response.

72.    Due to the delay, and obvious obstruction by Bruce Township, RTA withdrew its offer to Solvaris and moved on to other prospects.

73.    Through its malicious and intentional delay, the Bruce Township Board effectively prevented Plaintiffs from proceeding with a business transaction with RTA that would have benefited Plaintiffs and the Bruce Township community.

74.    Despite not wanting to exercise its option, Bruce Township maliciously and intentionally interfered with Plaintiffs' ability to consummate a transaction with RTA.

75.    Specifically, Bruce Township intentionally, maliciously, and/or recklessly delayed and failed to respond to numerous written and oral requests from Plaintiffs to provide a decision with respect to the RTA transaction.

76.    Bruce Township's delays and failures to respond to requests to approve the RTA transaction were purposely intended to thwart the transaction with RTA.

**Defendant Schapman's Personal Interests Interfere with Solvaris**

77.    Defendant Schapman, Bruce Township Planning Commission

Member, has consistently abused her appointed position and authority to further her own personal interests.

78. Schapman is the proprietor of Ingleside Farms, the Lessee of Township property adjacent to the Solvaris Tower, which is also located on Township land.

79. Ingleside Farms grows corn to feed livestock at the farm owned and operated by Schapman.

80. While Ingleside and Schapman have grown corn on Township property for many, many years, there was not a formal written lease for the property until 2011. The lease grants Schapman *de facto* "law enforcement" powers by granting her the right and authority to determine whether anyone is trespassing on the Township property located behind the property leased by Ingleside Farms.

81. The Township property behind Ingleside Farms, which is mostly comprised of woodlands and access to the Clinton River watershed, was effectively landlocked by Ingleside, and completely unknown to most Bruce Township residents, until the Solvaris Tower was erected.

82. Solvaris discovered the landlocked Township property, which is desirable for hunting, fishing, hiking, camping, and all manner of outdoor recreation, and opening advocated that same should be available for use by

all Township residents and was not under the exclusive purview and jurisdiction of Ingleside and Schapman.

83.    Ingleside does not meaningfully compensate the Township for the 80 acres it leases to grow corn – it pays $5,500 per year to the Township, a meager $68.75 per acre per year[1].

84.    In fact, upon information and belief, Bruce Township loses money on the Schapman lease as the rent is insufficient to cover the associated property taxes and other expenses for the property.

**Bruce Township Violates Its Own Ordinances and Again Harms Plaintiffs in 2020 and 2021**

85.    Regrettably, the RTA incident was not the last time the Defendants intentionally interfered with Plaintiffs' business.

86.    In early 2020, Bruce Township considered, and approved, a request to substantially expand a wireless communications tower on the Ford Proving Grounds, from 100 feet in height to 155 feet in height, along with substantial expansion of the surrounding support structures. **See Exhibit 12, Excerpt of Minutes of February 19, 2020 Bruce Township Board Meeting.**

---

[1] In contrast to the Ingleside / Schapman Lease, Solvaris pays $2,800 per acre for inferior land, nearly 4,000% more than Ingleside / Schapman. Factoring in the value of the 2 hot spots that Solvaris provides to Bruce Township at no cost to the Township, Solvaris actually pays approximately 13,470% more than Ingleside / Schapman.

87.    Such expansion required the applicant to undergo the SLU process, and as such, constitutes construction of a new tower for zoning and other approval purposes.

88.    According to Article 27, Section 27.38 of Bruce Township's Ordinance, the following provisions applied to construction of a new wireless communications, cellular, or similar tower in Bruce Township:

### ARTICLE 9
### RURAL SUBURBAN DISTRICT - R-S

**PREAMBLE**

The purpose of this district is to provide land for continued agricultural use and residential activities of a rural character and orderly low density development, in areas where public water and sewerage facilities are unlikely to be provided for an extended period of time; to protect the Township's natural resources and stabilize the essential characteristics of these areas in order to promote and encourage suitable environments for low density living. Other areas may also be so designated to protect open land from untimely and unplanned development and gradually, based upon the Township's adopted Master Plan, certain of these designated lands may be converted to their planned use.

**Section 9.02 SPECIAL LAND USES:**

The following special land uses and any use similar to those uses set forth in this Article may be granted approval by the Planning Commission if determined to be in accordance with the provisions of Article 27 of this Ordinance.

20.    Communication towers, personal wireless services (cell towers), and similar towers and antennas, subject to the provisions of Section 27.38. Such towers may only be

located in sections 16-21 of the Township. The Township recognizes that these six square miles offer a unique location for the siting of such towers, due to the natural elevation of the land, the limited impact on the adjoining parcels, and the existing "industrial" nature of the area.

…

## Section 18.02 SPECIAL APPROVAL LAND USES.

The following uses may be permitted by the Township Planning Commission subject to the general standards of Section 27.00 and the specific standards imposed for each use.

…

3.      Wireless Communication Towers (Section 27.38)

…

# ARTICLE 27

## SPECIAL LAND USE REVIEW PROCEDURES AND REQUIREMENTS FOR SELECTED SPECIAL LAND USES

## PREAMBLE

For all special land uses, a site plan shall be submitted to the Bruce Township Board and conform to the requirements and procedures for site plan review as described in Article 4. If the plans meet the required standards of this Ordinance, Article and applicable sections, and indicate no adverse effects which, in the opinion of the Township Board, cause injury to the residents, users, adjoining property, or the Township as a whole, the Township Board shall approve the use. The Township Board, **after a public hearing** and recommendation by the Planning Commission, shall have sole power to approve or disapprove all special land uses. **In consideration of all applications for special land use, the Township Board shall review each case individually as to its appropriateness and must find affirmatively to each of the following standards of the proposed land use if it is to be approved** (emphasis added). Such uses shall be subject to conditions, restrictions, and

safeguards deemed necessary to the interest of public health, safety and welfare. (emphasis added).

…

## Section 27.38    WIRELESS COMMUNICATION TOWERS.

### 1.    Purpose and Intent.

It is the general purpose and intent of Bruce Township to carry out the will of the United States Congress by authorizing communication facilities needed to operate wireless communication systems as may be required by law. However, it is the further purpose and intent of the Township to provide for such authorization only in a manner which will retain the integrity of neighborhoods and the character, property values and aesthetic quality of the community at large. In fashioning and administering the provisions of this Ordinance, an attempt has been made to balance these potentially competing interests.

It is the further purpose and intent of this Section to:

a.    Protect residential areas and land uses from the potential adverse impact of towers and antennas.

b.    Establish predetermined districts or zones of the number, shape, and in the location considered best for the establishment of wireless communication facilities as special land uses, subject to conformance with applicable standards.

c.    Ensure that wireless communication facilities are situated in appropriate locations and relationships to other land uses, structures and buildings, and limit inappropriate physical and aesthetic overcrowding of land use activities and adverse impact upon existing population, transportation systems, and other public services and facility needs by regulating and limiting the establishment, placement and manner of wireless communication facilities.

d.   Minimize the total number of towers or antennas throughout the community.

e.   Promote the public health, safety and welfare.

f.   **Provide for adequate public information about plans for wireless communication facilities** (emphasis added), and allow the Township to efficiently plan for the location of such facilities.

g.   Minimize the adverse impacts of technological obsolescence of such facilities, including timely removal of facilities.

h.   Encourage users of towers and antennas to configure them (stealth technology) in a way that minimizes the adverse visual impact of the towers and antennas through careful design, siting, landscape screening, and innovative camouflaging techniques.

i.   Avoid potential damage to adjacent properties from tower or antenna failure through engineering and careful siting of tower structures.

In furtherance of these goals, Bruce Township shall give due consideration to the Township's Master Plan, Zoning Ordinance, existing land uses, and environmentally sensitive areas in considering sites for the location of towers and antennas.

2.   **General Provisions.**

Commercial wireless communication towers, including their respective transmission towers, relay and/or receiving antennas, and normal accessory facilities involved in television, radio, microwave, cable systems, cellular, personal communication, and similar communication services and facilities, shall be permitted as a special land

use within limited sections of the R-S Rural Suburban District and the entire M-1 Industrial District and P-I Planned Industrial District, when found to be needed or desirable to the public convenience or welfare and in conformance with the following requirements. **Cellular towers are a permitted use on any property owned by Bruce Township and for any co-location on an existing structure. In fact, the Township locations are the preferred areas** (emphasis added). It is noted that communication towers do not fall under the classification of essential services, public utilities or local utilities and may in no way be regulated as such. (emphasis added).

a.   The submission shall contain a signed and sealed written explanation of the design characteristics and ability of the structure(s) and attendant facilities to withstand winds, ice and other naturally occurring hazards which shall be submitted by a State of Michigan Certified Professional Engineer. This information shall also address the potential for the tower or other mounting structure and/or antennas to topple over or collapse, and what tower configuration should be expected in such an event. Technical documentation of any information regarding these concerns shall also be provided.

b.   **The applicant shall demonstrate the need for the facility. If a new tower is proposed, the application shall include a map showing existing and known proposed wireless communication facilities and other structures which are suitable of co-location within the Township and, further, showing existing and known proposed wireless communication facilities and other structures suitable for co-location within areas surrounding the borders of the Township, in the location and area relevant in terms of potential co-location or in demonstrating the need for the proposed facility** (emphasis added). The Township may also request that the applicant provide a map or overlay

Page 22 of 51

identifying all of the tower locations, "search rings," or coverage areas within Bruce Township and the nearest adjoining units of government which are within a one-mile radius of the applicant's site. The Township may also require the applicant to show why a cable-based, fiber optic, or similar system cannot or should not be used in lieu of a wireless communication tower.

c.   **In order to maximize the efficiency of providing such services, while minimizing the negative impact of such facilities on the Township, co-location of such facilities on an existing tower or other existing structure is required, when feasible. An applicant shall furnish written documentation as to why a co-location at another site is not feasible and whether they have, in fact, contacted the owners of existing facilities to determine if co-location is possible. This documentation should also show that co-location was economically infeasible** (emphasis added). If the application represents a new tower/antenna facility, the applicant shall provide a letter of intent to lease any excess space on a tower facility and shall commit itself to:

(1)   promptly responding to any requests for information from a potential co-user of their tower/antenna;

(2)   negotiate in good faith and allow for leased, shared use of the facility, when it is technically practical; and

(3)   make no more than a reasonable charge for a shared use lease.

d.   The location and improvement of facilities, as provided for herein, shall also be subject to the following additional requirements:

(1)   The Township strongly encourages the development of towers on suitable Township-owned property.  Towers one hundred seventy-five (175) feet or less in height, may be located as a permitted use on any property owned by Bruce Township.  Towers between one hundred seventy-six (176) feet and two hundred (200) feet in height require special land use approval on any property owned by Bruce Township.

…

**3.   Procedures.**

**Once all information has been collected and the public hearing has been held (if necessary), the Planning Commission shall make its recommendation to the Township Board stating finding of fact which support a recommendation for approval or denial. Any stipulations of approval which may be pertinent shall also be submitted to the Board. The Township Board shall render their decision after reviewing all relevant information to the case. The record of the Planning Commission and Township Board shall include findings of fact and evidence to support such decisions. The written findings and conclusions shall be contained in the minutes of the Commission and Board** (emphasis added).

**Article 27, Section 27.38 of Bruce Township Ordinance 161 – Zoning, prior to October 7, 2020 amendment, attached as Exhibit 13 hereto.**

89.   The new tower was approved for construction on the Ford Proving Grounds, at a location which is only 2.9 miles from the Solvaris Tower.

90.    Solvaris was not contacted concerning the possibility of collocating on the Solvaris Tower, as required by the Bruce Township Ordinance 161, Article 27, Section 27.38(2)(b).

91.    Solvaris did not receive notice regarding the public hearing concerning the new tower, as required by the Township Ordinance, although the properties adjacent to Solvaris received such notices.

92.    On or about February 19, 2020, Bruce Township held a regular Board meeting during which it approved extensive reconstruction and expansion of the existing tower from 100 feet to 155 feet, per the Planning Commission's recommendations. **See Exhibit 12, February 19, 2020 Bruce Township Board Meeting Minutes.**

93.    For reasons unknown to Plaintiff, and undisclosed by Defendants, the new Ford Proving Grounds tower was not erected in 2020.

94.    Bruce Township amended Article 27, Section 27.38 concerning Wireless Towers, effective October 7, 2020. The substantive portions of this Section did not change. **See Article 27, Section 27.38 of Bruce Township Ordinance 161 – Zoning, as amended effective October 7, 2020, attached as Exhibit 14 hereto.**

95.    On or about February 10, 2021, Bruce Township held a Planning Commission Special Land Use Meeting, during which it approved, under the

newly amended Section 27.38 of Ordinance 161, the construction of a WiCOM Tower and colocation of AT&T Mobility on the newly constructed tower.

96.    Solvaris was again not contacted concerning the possibility of colocating on the Solvaris Tower, as required by the Bruce Township Ordinance 161, Article 27, Section 27.38(2)(b).

97.    Solvaris again did not receive notice regarding the public hearing concerning the WiCOM tower and AT&T colocation, as required by the Township Ordinance, although the properties adjacent to Solvaris received such notices.

98.    These approvals were made in direct contradiction of Bruce Township Ordinance 161, Article 27, Section 27.38(2)(b), which provides:

> In order to maximize the efficiency of providing such services, while minimizing the negative impact of such facilities on the Township, co-location of such facilities on an existing tower or other existing structure is required, when feasible. **An applicant shall furnish written documentation as to why a co-location at another site is not feasible and whether they have, in fact, contacted the owners of existing facilities to determine if co-location is possible**. This documentation should also show that co-location was economically infeasible. *Id*. (emphasis supplied).

99.    Thus, Bruce Township approved WiCOM's request in direct violation of its own ordinance, and in at least the following ways: (1) Bruce

Township failed to enforce Section 27.38(2)(b)'s unambiguous commands;
(2) Bruce Township failed to require WiCOM, AT&T Mobility, and American
Tower to contact Solvaris to explore colocation on its existing tower (which
is located on Bruce Township property); (3) Bruce Township failed to instruct
WiCom, AT&T Mobility, or American Tower to follow proper procedures for
the construction of wireless communication towers under Section
27.38(2)(b); and (4) Bruce Township failed to give Plaintiffs proper notice
and an opportunity to be heard, as intended for them under Section
27.38(2)(b), and other provisions, of Bruce Township Zoning Ordinance 161.

100.  On March 9, 2021, Plaintiffs submitted an Appeal to the Bruce
Township Zoning Board of Appeals, as an aggrieved party, concerning the
Township's approval of the new WiCOM/AT&T Tower. **See Exhibit 15**.

101.  On March 10, 2021, Defendants perfunctorily denied Plaintiffs'
appeal request, stating that no administrative remedy was available to
Plaintiffs. **See Exhibit 16**.

**Bruce Township Erroneously Accuses Solvaris of Breach of Contract**

102.  On January 26, 2021, Bruce Township, through current
Supervisor Michael Fillbrook ("Fillbrook"), sent a letter to Lauer regarding the
Original Lease and indicated that "[i]t has come to the Township's attention
that as of January 1, 2021 Air Advantage acquired the wireless network

operations of Solvaris Net." **Exhibit 17, 1/26/21 Bruce Township Letter**.

103.  Fillbrook (erroneously) stated that this event "constitute[d] an assignment/transfer of a portion of the Ground and Tower Lease Agreement entered into and effective on August 22, 2013." *Id*.

104.  In addition, Fillbrook indicated (erroneously) that "assignment and transfers of any part of the Agreement are subject to advanced written approval of the Township." *Id*.

105.  Fillbrook's statements were, and are, untrue because only an assignment and transfer of *50% or more* of Solvaris is subject to advanced written approval of the Township; not assignment and transfers of *any* part of the Agreement as asserted by Fillbrook.

106.  On January 29, 2021, Solvaris (through counsel) sent letters to Bruce Township, Schapman, and Walker demanding that both Schapman and Walker cease and desist from making slanderous and libelous statements about Solvaris and Lauer. **Exhibit 18, 1/29/21 Cease and Desist Letter to Schapman and Walker**.

107.  The cease-and-desist letters were prompted, in part, by statements made on January 20, 2021, during a Bruce Township Board Meeting, including a text message read into the record by Bruce Township Clerk Kraft stating: "Matt Lauer is a crook. Make him tear down the tower."

108.   During the January 20, 2021 meeting, Clerk Kraft read into the record, verbatim, the above text message which she claimed was an anonymous text from a Township resident. However, it was not anonymous; in fact, Schapman was the author of that text message. **Exhibit 19, text message of Connie Schapman**.

109.   Defendant Walker echoed these sentiments by stating, during the January 20, 2021 Bruce Township Board Meeting, that Solvaris was attempting to circumvent the provisions of its lease with the township and illegally profiting under its contract.

110.   These statements, while entirely false, were published orally and in writing to the relevant public, causing embarrassment, emotional distress, and damage to Plaintiffs' business and personal reputation in the community.

111.   Schapman and Walker knew, or reasonably should have known, that their statements were false when made.

112.   Beyond demanding that Schapman and Walker cease and desist from making slanderous and libelous statements about Solvaris and Lauer, the letters demanded a formal and public retraction of the statements. **See Exhibit 18**.

113.   To date, no such retractions have been issued.

114.   On January 31, 2021, Plaintiffs' counsel sent a letter to Bruce

Township making clear that no assignment or transfer of Solvaris requiring Township approval had occurred. **Exhibit 20**, 1/31/21 Solvaris Letter.

115. Specifically, Solvaris indicated that (1) "Solvaris sold less than thirty (30%) percent of its assets to Air Advantage on January 21, 2021," which did not require prior approval by Bruce Township; (2) "Solvaris did not sell the tower which was constructed as a part of the Ground and Tower Lease dated August 30, 2013, as amended"; and (3) "Solvaris did not sell, assign, or transfer the Ground and Tower Lease dated August 30, 2013, as amended to Air Advantage." *Id*., at p. 2.

116. On February 26, 2021, Bruce Township sent a letter regarding this matter directly to Lauer, despite knowing he was represented by counsel. **Exhibit 21, 2/26/21 Bruce Township Letter.**

117. This letter reiterated Bruce Township's (mistaken) belief that Solvaris's transfer of assets to Air Advantage required prior approval by Bruce Township. *Id*.

118. Bruce Township claimed it sent the February 26, 2021 letter to Solvaris because it never received the January 31, 2021 letter from Plaintiffs' counsel sent to the Township's Attorney, Christine Anderson.

119. Plaintiffs' counsel, Attorney Reese Serra, immediately responded to the erroneous allegation that Solvaris has not responded to

Bruce Township's January 26, 2021 letter.

120.  On March 3, 2021, Attorney Serra again forwarded Solvaris's January 31, 2021 response to Bruce Township's attorney, and yet again on April 21, 2021. On April 21, 2021, Attorney Serra additionally forwarded Solvaris's January 31, 2021 response to the Bruce Township Clerk and all Bruce Township Board Members. **See Emails at <u>Exhibit 22</u>**.

121.  To date, not a single recipient has acknowledged receipt of the letter from Plaintiffs' counsel dated January 31, 2021.

122.  Defendants have chosen to ignore the correspondence and explanation from Plaintiffs' counsel, and continue to accuse Solvaris of breaching the Lease with Bruce Township.[2]

123.  Remarkably, Schapman's slanderous and libelous statements continued. Specifically, on April 28, 2021 Schapman sent the following text message to Bruce Township:

> I am frustrated, what right does Matt have to go beyond his leased property along tree line, to get to back lakes. They haven't even formed their committee yet so why can they

---

[2] Since January of 2021, Solvaris has been inundated with a barrage of demands concerning the partial sale of its business assets to Air Advantage, and unfounded allegations that Solvaris is in breach of its Agreement with Bruce Township. Simply put, ***Bruce Township is not entitled to receive, scrutinize, and publicize the Solvaris - Air Advantage assignment***. Presumably, the Township's attorney has explained this, but inexplicably, the Township and certain members of the Planning Commission, including Defendants Schapman and Walker, are so  intent on harassing Plaintiffs that they continue to carelessly and recklessly disregard the information received from their own attorney and Plaintiffs' attorney.

trespass. When we plant the crop are they still going to go along the tree line, step on My crop to get to where the wooden stakes are to enter the woods? What right do they have to go beyond his fenced tower area? They are intruding on my leased property. Mike doesn't seem to care, they are running the show. Do u complain to entire board? That is just two people fighting I don't care, mike would say. Please give me some good news on the law suit. I shouldn't have to put up with this. Entire board needs to tell them to stop trespassing. **See <u>Exhibit 23</u>**.

124.   On May 12, 2021, Plaintiffs (through counsel) sent a letter to Bruce Township again demanding that Schapman cease and desist from making slanderous and libelous statements. **<u>Exhibit 24</u>, 5/12/21 Solvaris Letter**.

125.   During the May 20, 2021 Bruce Township Board meeting, Defendant Schapman, who has an obvious bias against Plaintiffs, strongly advocated for taking legal action against Solvaris for its alleged breach of the Original Lease, as amended.

### Bruce Township Fails to Properly Respond to Plaintiffs' FOIA Request

126.   On or about January 28, 2021, Lauer submitted a Freedom of Information Act ("FOIA") request to Bruce Township. **<u>Exhibit 25</u>, 1/28/21 Lauer FOIA Request.**

127.   On or about February 1, 2021 and February 4, 2021, Bruce Township responded to Lauer's FOIA request. These responses were

incomplete and did not include plainly responsive documents.

128. Specifically, Bruce Township's FOIA response did not include Township Clerk Susan Kraft's January 22, 2021, email to Air Advantage.

129. Clerk Kraft's email to Air Advantage was eventually produced on March 3, 2021, after some prompting by Plaintiffs. **See Exhibit 26**, **March 3, 2021 and February 4, 2021 emails from Bruce Township Clerk Kraft.**

131. Clerk Kraft authored the email and copied Christine Anderson, counsel for Bruce Township. The email confirmed that a voicemail message she just left indicated that the contract between Plaintiffs and Air Advantage may not be "kosher" and "on the up and up." **See uncertified transcript of voicemail message, Exhibit 27**.

132. Clerk Kraft's voicemail to Air Advantage also made false statements about her ability to obtain information directly from Solvaris. **See Exhibit 27**.

133. Clerk Kraft interfered with Plaintiffs' business operations, specifically, Plaintiffs' business activities with Air Advantage.

134. This interference with Plaintiffs' business activities during a due diligence and indemnification period, and while payments were scheduled to be made, was with malicious intent to disrupt, deter, or otherwise interfere

with Plaintiffs' pending partial sale of its business to Air Advantage.

## Governmental Immunity Does Not Apply

135.  The Michigan Governmental Tort Liability Act, MCL 691.1401, *et seq*. ("GTLA"), generally provides immunity to liability arising out of the performance of a governmental function to governmental agencies, officers, and employees. MCL 691.1407(1).

136.  However, there are exceptions to the immunity provided by the GTLA, such as breach of contract, gross negligence, and constitutional claims.

137.  In *Odom v. Wayne Co.*, 760 N.W.2d 217, 224-25 (Mich. 2008), the Michigan Supreme Court clarified the standards concerning whether an individual government employee was entitled to qualified immunity as to tort liability. The Michigan Supreme Court found that as to *intentional* torts, pursuant to MCL 691.1407(3), the test set forth in *Ross v. Consumers Power Co. (On Rehearing)*, 420 Mich. 567, 363 N.W.2d 641 (1984) is the correct standard. The Michigan Supreme Court then restated the *Ross* test:

> Under Ross, to be immune from liability for intentional torts, the governmental employee must first establish that the acts were taken "during the course of ... employment and" that the employee was "acting, or reasonably believe[d] [he was] acting, within the scope of [his] authority[.]"
>
> …

The governmental employee must also establish that he was acting in "good faith." *Ross* did not elaborate on this element, relying instead on Prosser on Torts and the cases cited therein. Prosser noted that the "considerable majority of the state courts take the position that **there is no immunity where the inferior officer does not act honestly and in good faith, but maliciously, or for an improper purpose." "[O]fficial immunity should not become a cloak for malicious, corrupt, and otherwise outrageous conduct on the part of those guilty of intentional abuse of power...."** The cases cited by Prosser indicate that there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another. Odom v. Wayne Co.*, 760 N.W.2d 217, 224-25 (Mich. 2008).

…

138.  Defendants' conduct was at all times at least grossly negligent, and in many, if not all, instances was malicious, intentional, and aimed at harming Plaintiffs.

139.  Defendants cannot reasonably rely on any type of governmental immunity to defend the allegations contained herein, because Defendants' actions constitute the intentional misuse of governmental authority for unlawful purposes, including but not limited to harming Plaintiffs' business, interfering with Plaintiffs' contractual relationships, interfering with Plaintiffs' business expectancies, and defaming Plaintiffs.

140.  Defendants were not acting within the scope of their authority when they engaged in this course of conduct, nor were any of these described activities a discharge of governmental functions. Surely, the

government does not function to intentionally harm businesses, or interfere with private contracts, or defame individuals and businesses.

141.  Because Defendants' activities were conducted with malicious intent and outside of their scope of authority, they cannot rightfully claim to have been engaged in a "governmental function."

142.  Given this egregious course of conduct, Defendants are not entitled to any form of governmental immunity.

<u>**COUNT I**</u>
**Tortious Interference with A Contract or Contractual Relations – Air Advantage**

143.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

144.  Plaintiffs had a contract and/or contractual relations with Air Advantage.

145.  Defendants intentionally interfered with Plaintiffs' contract and/or contractual relations with Air Advantage.

146.  The Defendants acted intentionally and with malice when they directed, and engaged in, a course of conduct directed at interfering with Plaintiffs' contract and/or contractual relations with Air Advantage, despite no justification for so doing.

147.  As a direct and proximate result of Defendants' tortious

interference, Plaintiffs have been damaged, and request an award of all damages compensable by law.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count I in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT II
## Tortious Interference with A Business Relationship or Expectancy - RTA

148. Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

149. Tortious interference with a business relationship of expectancy involves:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. [*Health Call of Detroit v Atrium Home & Health Care Servs*, *Inc*, 268 Mich App 83, 90; 706 NW2d 843 (2005) (citations omitted).]

150. Plaintiffs had a valid business relationship and/or expectancy with RTA.

151. Defendants were aware of Plaintiffs' business relationship and/or

expectancy with RTA.

152. Defendants intentionally interfered with Plaintiffs' business relationship and/or expectancy with RTA by directing and/or causing damage to Plaintiffs' business relations with RTA by hindering and/or destroying Plaintiffs' agreement with RTA.

153. As a direct and proximate result of Defendants' tortious interference, Plaintiffs have been damaged, and request an award of all damages compensable by law.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count II in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT III
### Tortious Interference with a Business Relationship or Expectancy – AT&T

154.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

155.  Plaintiffs had a valid business operation of providing wireless Internet through its wireless tower that resides on land leased from Bruce Township.

156.  Defendants were aware of Plaintiffs' business operation.

157. Defendants intentionally interfered with Plaintiffs' business operations by failing to direct WiCOM/AT&T to explore the possibility of colocation on the Solvaris Tower, contrary to its own ordinances.

158. Contrary to its own ordinances, Bruce Township approved WiCOM/AT&T's SLU and allowed construction of a new wireless communications tower less than 3 miles from the Solvaris Tower, causing damage to Plaintiffs' business operations.

159. AT&T is a direct competitor of Solvaris.

160. There does not exist a plausible business, technological, or other reason for a new wireless communications tower to be constructed 2.9 miles from the Solvaris Tower.

161. The Solvaris Tower could and would have accommodated a co-location by AT&T.

162. Colocation of AT&T on the Solvaris Tower would have benefited Bruce Township residents by avoiding the construction of a new 155-foot tower less than 3 miles from the Solvaris Tower, which is a stated goal of the Township in its ordinances and Master Plan.

163. Co-location of AT&T on the Solvaris Tower would have fulfilled the Township's stated preference for colocation and placement of wireless communications towers and equipment on Township property.

164. As a direct and proximate result of Defendants' tortious interference, Plaintiffs have been damaged, and request an award of all damages compensable by law.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count III in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT IV
### Violations Of Michigan's Freedom of Information Act

165. Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

166. As alleged above, Bruce Township failed to produce responsive documents Plaintiffs know to, or have reason to believe, exist and are responsive to Plaintiffs' FOIA request.

167. Bruce Township's failure to produce responsive documents constitutes a denial under MCL § 15.231, et. seq., including MCL § 15.235.

168. Alternatively, Bruce Township's unreasonable delay in producing responsive documents constitutes a denial under MCL § 15.231, et. seq., including MCL § 15.235, § 15.240(1), and/or § 15.240(7).

169. Bruce Township's actions in failing to produce responsive documents and/or engaging in unreasonable delay in production were

arbitrary and capricious within the meaning of MCL § 15.240(7), which subjects Bruce Township to certain fines and/or penalties.

170. Bruce Township's actions in failing to produce responsive documents and/or engaging in unreasonable delay constitute willful and intentional failure to comply under MCL § 15.240b, which subjects Bruce Township to certain fines and/or penalties.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants  and grant Plaintiffs full relief under MCL § 15.231, *et. seq.*, including ordering Bruce Township to pay any and all fines and/or penalties under MCL § 15.240(7) and/or MCL § 15.240b, and any other relief the Court deems appropriate.

## <u>COUNT V</u>
## **Defamation By Schapman Against Plaintiffs**

171.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

172. Defendant Schapman published and/or made false and defamatory statements concerning Plaintiffs, to wit, that Plaintiffs were crooks and engaged in unfair contractual dealings.

173. Defendant Schapman published these statements by making them orally and causing them to be reproduced to the public electronically.

174.  Despite Plaintiffs' multiple demands for Defendant Schapman to

retract these false and defamatory statements, Defendant Schapman has not retracted her false and defamatory statements.

175.   Defendant Schapman acted with malice when she published these false and defamatory statements concerning Plaintiffs, i.e., Defendant Schapman acted with the intent to injure Plaintiffs' business and reputation, or in the alternative, Defendant Schapman was negligent in making the false and defamatory statements.

176.   As a direct result of Defendant Schapman's false and defamatory statements, Plaintiffs' business and reputation were harmed. Additionally, Plaintiff Lauer suffered emotional damages as a direct result of Defendant Schapman's false and defamatory statements.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count V in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT VI
## Defamation By Walker Against Plaintiffs

177.   Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

178.   Defendant Walker published and/or made false and defamatory statements concerning Plaintiffs, to wit, that Plaintiffs engaged in unfair

contractual dealings.

179.  Defendant Walker published these statements by making them orally and causing them to be reproduced to the public electronically.

180.  Despite Plaintiffs' demand for Defendant Walker to retract these false and defamatory statements, Defendant Walker has not retracted his false and defamatory statements.

181.  Defendant Walker acted with malice when he published these false and defamatory statements concerning Plaintiffs, i.e., Defendant Walker acted with the intent to injure Plaintiffs' business and reputation, or in the alternative, Defendant Walker was negligent in making the false and defamatory statements.

182.  As a direct result of Defendant Walker's false and defamatory statements, Plaintiffs' business and reputation were harmed. Additionally, Plaintiff Lauer suffered emotional damages as a direct result of Defendant Walker's false and defamatory statements.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count VI in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT VII
### Civil Conspiracy

183.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

184.  Defendants engaged in concerted action with those known and unknown, including Bruce Township, Schapman, and Walker to defame and damage Plaintiffs' character, business, and reputation.

185.  Defendants engaged in concerted action with those known and unknown, including Bruce Township, Schapman, and Walker to tortiously interfere with Plaintiffs' business and/or business expectancy and/or contracts and/or contractual relationships.

186.  Defendants took these actions for an unlawful purpose, i.e., to cause damage to Plaintiffs' character, reputation, and/or business.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count VII in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT VIII
### Violation of 42 USC § 1983

187.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

188.  Plaintiffs had a property interest pursuant to the Due Process Clause of the Fourteenth Amendment which includes a constitutionally legitimate claim to pursue its business free from unreasonable and arbitrary government interference and the ability to contract freely with unreasonable and arbitrary government interference.

189.  Plaintiffs have a property interest in its business operations, including its contract with Air Advantage and its prior prospective contractual relationship with RTA. Such interests have been recognized as a "species of property" within the Due Process Clause of the Fourteenth Amendment.

190.  Under constitutional law, Plaintiffs' property interests are clearly established.

191.  Plaintiffs were likewise denied Due Process when, as described above, Defendants denied, caused undue delay, unreasonably withheld permission, or otherwise interfered with the opportunity for other businesses to operate at the site of Plaintiffs' wireless tower, without proper notice and an opportunity for Plaintiffs to be heard.

192.  The Defendants engaged in concerted activity and hostile actions directed towards Plaintiffs with an intent to harm their ongoing business, contractual, and/or property interests.

193.  This scheme was the policy and custom of Bruce Township,

whose ultimate goal was to disrupt, interfere with, and/or destroy Plaintiffs' ongoing business, contractual, and/or property interests.

194.  As a direct and proximate result of the Defendants' conduct, Plaintiffs' procedural and substantive due process rights were violated.

195.   As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered, and continue to suffer, irreparable harm and seek all damages compensable under law.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count VIII in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT IX
## Michigan Constitutional Tort Claim

196.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

197.  Bruce Township is abusing its position as a public entity, and through its officers and/agents, including Schapman and Walker, engaged in a scheme to harm Plaintiffs' ongoing business, contractual, and/or property interests.

198.  This scheme was the policy and custom of Bruce Township, whose ultimate goal was to disrupt, interfere with, and/or destroy Plaintiffs'

ongoing business, contractual, and/or property interests.

199. Plaintiffs have several rights under the Michigan Constitution, including their right to equal protection of the law, Const 1963 Art 1 § 2; their right not to have any of their contracts impaired, Const 1963 Art 1 § 10; and their right not to be deprived of life, liberty, or property without due process of law, Const 1963 Art 1 § 17.

200. By employing the scheme previously described, and carried out as a custom and policy of Bruce Township, the scheme amounted to be the moving force behind the violation of Plaintiffs aforementioned rights under the Michigan Constitution.

201. As a direct result of this conduct, Plaintiffs did suffer, and continue to suffer, irreparable harm, and seek all damages compensable under law.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count IX in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT X
### Intentional Infliction of Emotional Distress

202. Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

203.  Defendants have engaged in extreme and outrageous conduct, to wit, publicly defaming Plaintiffs and consistently and intentionally interfering with Plaintiffs' business operations and/or contractual relationships and business expectancies.

204.  As detailed above, Defendants' conduct is either intentional, or done recklessly and without regard for its consequences.

205.  As a direct result of Defendants' conduct, Lauer has suffered extreme emotional distress.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count X in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## **COUNT XI**
### **42 U.S.C. § 1983 - Violations of the Takings Clause**

206.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

207.  The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

208.  Plaintiffs had a cognizable property interest at 76700 Hipp Road, near the 36 Mile Road and Hipp Road intersection, where the Solvaris Tower

was located.

209.  By preventing other companies from operating at or on the location of the Solvaris Tower, including but not limited to RTA and AT&T, Defendants caused a *de facto* taking of Plaintiffs' property and deprivation of Plaintiffs' constitutionally protected rights.

210.  In addition, by preventing other companies from operating at or on the location of the Solvaris Tower, including but not limited to RTA and AT&T, Defendants caused diminution in the value of Plaintiffs' property.

211.  Plaintiffs' property was seized, intruded on, and/or diminished in value by Defendants' actions.

212.  Defendants did not provide any compensation to Plaintiffs as a result of their actions.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count XI in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

## COUNT XII
### Michigan Constitutional Takings Claim

213.  Plaintiffs incorporate by reference all allegations contained in this Verified Complaint as though fully set forth herein.

214.  Private property shall not be taken for public use without just compensation. Const 1963 art. 10, § 2.

215.  Plaintiffs had a cognizable property interest at 76700 Hipp Road, near the 36 Mile Road and Hipp Road intersection, where the Solvaris Tower was located.

216.  By preventing other companies from operating at or on the location of the Solvaris Tower, including but not limited to RTA and AT&T, Defendants caused a *de facto* taking of Plaintiffs' property and deprivation of Plaintiffs' constitutionally protected rights.

217.  In addition, by preventing other companies from operating at or on the location of the Solvaris Tower, including but not limited to RTA and AT&T, Defendants caused diminution in the value of Plaintiffs' property.

218.  Plaintiffs' property was seized, intruded on, and/or diminished in value by Defendants' actions.

219.  Defendants did not provide any compensation to Plaintiffs as a result of their actions.

WHEREFORE, Plaintiffs request that this Honorable Court enter a judgment in its favor against Defendants for Count XII in excess of $75,000, plus interest, attorney's fees, costs, and any other relief the Court deems appropriate.

**PLAINTIFFS' VERIFICATION**:

I certify that the above information is true to the best of my knowledge, information, and belief.

X_____       Date:_8/18/2021___
**Matthew Lauer**
**Solvaris Net, LLC**


                                    Respectfully submitted,

                                    SERRA LAW FIRM, PLLC
                                    (dba THE PRIVATE FIRM)


Dated: August 18, 2021              /s/ *Reese Serra*_____
                                    Reese Serra (P74482)
                                    Mateusz Wozniak (P78554)
                                    Attorneys for Plaintiffs
                                    805 Oakwood Dr. Ste 101
                                    Rochester, MI 48307
                                    248-840-3139
                                    info@thefirm.net


## JURY DEMAND

Plaintiffs hereby demand a trial by Jury in this case.

_____
REESE SERRA (P74482)